**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 10-21667-Civ-COOKE/TURNOFF**

MARLENIS SMART,

     Plaintiff,

vs.

CITY OF MIAMI BEACH, FLORIDA,

     Defendant.

_____/

## OMNIBUS ORDER REGARDING DEFENDANT'S POST-TRIAL MOTIONS

THIS MATTER is before me on Defendant City of Miami Beach, Florida's Rule 50(b) Renewed Motion for Judgment as a Matter of Law ("Motion for JNOV") (ECF No. 173) and Defendant City of Miami Beach, Florida's Alternative Motion for New Trial ("Motion for New Trial") (ECF No. 178).  Plaintiff Marlenis Smart filed her Response to Defendant's Rule 50(b) Renewed Motion for Judgment as a Matter of Law, Rule 59 Motion for New Trial and Motion for Remittitur and/or to Amend Judgment to Reduce Damages Pursuant to Limitation Set Forth in 42 U.S.C. § 1981a(b)(3)[1].  (ECF No. 195).  Defendant City of Miami Beach, Florida submitted its Reply to Plaintiff's Response to Defendant's Rule 50(b) Renewed Motion for Judgment as a Matter of Law, Motion for New Trial and Motion for Remittitur to Amend Judgment.  (ECF 197).  Thus, Defendant City of Miami Beach, Florida's Rule 50(b) Renewed Motion for Judgment as a Matter of Law and Alternative Motion for New Trial are fully briefed and ripe for adjudication.

_____

[1] I previously ruled upon Defendant's Motion for Remittitur and/or to Amend Judgment to Reduce Damages Pursuant to Limitation Set Forth in 42 U.S.C. § 1981a(b)(3) and Motion for New Trial or Remittitur as to Excessive Damages (ECF No. 161) and Plaintiff's Motion to Amend/Correct Final Judgment (ECF No. 157) on September 13, 2012 following a hearing held on the same.  *See* Endorsed Orders (ECF Nos. 211, 212).

I have considered Defendant City of Miami Beach, Florida's ("Defendant" or the "City") Rule 50(b) Renewed Motion for Judgment as a Matter of Law and Alternative Motion for New Trial, the Response and Reply thereto, and am otherwise duly advised in the premises. Having fully reviewed the record, including trial transcripts, and the relevant legal authorities, and having had an opportunity to thoroughly reflect on the testimony presented at trial months later, removed from the demands of the proceeding, I find legal and factual merit in the City's position. Thus, for the reasons provided herein, Defendant's Rule 50(b) Renewed Motion for Judgment as a Matter of Law is granted and Defendant's Alternative Motion for a New Trial is denied as moot, but conditionally granted pursuant to Federal Rule of Civil Procedure 50(c).

## BACKGROUND[2]

Plaintiff asserted claims against Defendant City of Miami Beach, Florida for sexual harassment and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq.  See* Pl.'s Second Am. Compl., ECF No. 40. Following the partial denial of Defendant's Motion for Summary Judgment (ECF No. 96), the matter proceeded to jury trial, which was held from February 13, 2012 through March 9, 2012. At the conclusion of trial, and subsequent to the denials of Defendant's motions for directed verdict (Trial Tr. vol. VI, 132-137, ECF No. 182; Trial Tr. vol. XIV, 84-100, ECF No. 190), the jury granted a verdict in favor of Ms. Smart and against the City on the sexual harassment claim, but in favor of the City and against Ms. Smart on the retaliation claim.  *See* Jury Verdict, ECF No. 154. Specifically, the jury found that the "Defendant subjected her to a sexually hostile work environment by subjecting her to acts of sexual harassment which were so severe and pervasive as to create a hostile and abusive working

---

[2] The underlying factual framework is more fully set forth in Section I of the Order On Defendant's Motion for Summary Judgment (ECF No. 96).

environment;" and that the Defendant did not "exercise[] reasonable care to prevent any sexually harassing behavior in the workplace and that [] Plaintiff [neither] failed to use the procedures in place to promptly report any harassment [n]or [did] Defendant t[ake] prompt and reasonable action after the Plaintiff took advantage of the preventive or corrective opportunities provided by the Defendant." *Id.* Judgment was then entered in favor of Plaintiff and against the Defendant in the amount of $700,000, as awarded by the jury for Plaintiff's "emotional pain and mental anguish [suffered] as a proximate result of sexual harassment by Defendant." *See* Final Judgment, ECF No. 156.

Contending that the evidence is insufficient to support a verdict in favor of Plaintiff because Ms. Smart was not subjected to severe and/or pervasive sex or gender-based harassment, and even if she were, the City took prompt and immediate remedial measures likely to prevent the conduct from recurring, the City has filed the instant Rule 50(b) Renewed Motion for Judgment as a Matter of Law (ECF No. 173). On these grounds and on the bases that the Defendant has obtained new evidence further demonstrating that Plaintiff and her mother, Maria Cruz, tampered with witnesses, and prejudicial and inadmissible evidence was admitted while relevant admissible evidence was excluded, the City has also moved for a new trial pursuant to Federal Rule of Civil Procedure 59. Collectively opposing both of Defendant's Motion for JNOV and Motion for New Trial, Plaintiff asserts that the greater weight of the evidence allows a reasonable jury to find that the City subjected her to a sexual harassment hostile work environment and the City did not take reasonable action to prevent or correct the harassment. *See* Pl.'s Resp. ¶¶ 3-4 at 2, 4-5, ECF No. 195. Therefore, Plaintiff urges that Defendant's Motion for JNOV and Motion for New Trial be denied and the judgment in favor of Plaintiff Marlenis Smart be upheld.

**LEGAL STANDARD**

**A.      Judgment as a Matter of Law**

Defendant, the City, moves for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), which permits the entry of judgment as a matter of law, amongst other relief, following the submission of the action to the jury, subject to the court's later determination of the legal questions raised by the motion, if the court did not grant a motion for judgment as a matter of law made under Rule 50(a).  Fed. R. Civ. P. 50(b).  A party is entitled to judgment as a matter of law "[i]f a party has been fully heard on an issue … and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).  Put simply, "a motion for judgment as a matter of law will be denied only if reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions."  *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir.1999)) (internal quotations omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 424, 250-51 ("[T]he standard for a directed verdict under Federal Rule of Civil Procedure 50(a) … is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.  If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.") (internal citations omitted); *Bazile v. Bisso Marine Co., Inc.*, 606 F.2d 101, 104 (5th Cir. 1979[3]) ("The standard for granting a motion for a judgment notwithstanding the verdict requires that the trial court review all the evidence in the light most favorable to the opponent of the motion and if the trial court still finds that the facts and inferences point so

---

[3] The Eleventh Circuit has adopted, as binding precedent, all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

strongly and overwhelmingly in favor of one party that reasonable men could not arrive at a contrary verdict, the motion for a judgment notwithstanding the verdict should be granted.").

In evaluating a motion for judgment as a matter of law, the evidence is reviewed in the light most favorable to the non-moving party, but the "non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Abel*, 210 F.3d at 1337 (citing *Mendoza*, 195 F.3d at 1244 (11th Cir.1999)); *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) ("We must also keep in mind, however, that a 'mere scintilla of evidence does not create a jury question; there must be a substantial conflict in evidence to create a jury question.'"). "To summarize, [I] must consider all the evidence in the light most favorable to [Ms. Smart] and determine whether or not reasonable jurors could have concluded as this jury did based on the evidence presented." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (quoting *Quick v. Peoples Bank*, 993 F.2d 793, 797 (11th Cir.1993)) (internal quotations omitted).

A Rule 50 motion for judgment as a matter of law is reviewed *de novo* by the appellate court. *Combs*, 106 F.3d at 1526 (11th Cir. 1997); *Abel v. Dubberly*, 210 F.3d at 1337.

**B.     Motion for a New Trial**

Federal Rule of Civil Procedure 50(b) allows a party moving for judgment as a matter of law to also move, in the alternative, for a new trial under Federal Rule of Civil Procedure 59. Fed. R. Civ. P. 50(b).  "The court may, on motion, grant a new trial on all or some of the issues--and to any party-- … (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court…." Fed. R. Civ. P. 59(a)(1)(A).  The City asserts that it is entitled to a new trial on Ms. Smart's sexual harassment claim on three grounds: first, the verdict is against the greater weight of the evidence; second, new evidence demonstrates

5

that Ms. Smart and her mother, Ms. Cruz, deliberately tampered with witnesses to undermine the proceedings; and third, prejudicial and inadmissible evidence was admitted while relevant, admissible evidence was excluded.

"A trial judge may grant a motion for a new trial if he believes the verdict rendered by the jury to be contrary to the great weight of the evidence.  In ruling on a motion for new trial, the trial judge is permitted to weigh the evidence, but to grant the motion he must find the verdict contrary to the great, not merely the greater, weight of the evidence." *Watts v. Great Atl. & Pac. Tea Co., Inc.*, 842 F.2d 307, 310 (11th Cir. 1988) (citing *Williams v. City of Valdosta*, 689 F.2d 964, 972 (11th Cir. 1982)).  Additionally, "[t]he district court should grant a new trial [] if "the verdict ... will result in a miscarriage of justice." *Quick v. City of Birmingham*, 346 F. App'x 494, 495 (11th Cir. 2009).  While the grant or denial of a motion for new trial is reviewed for abuse of discretion, *Tucker v. Hous. Auth. of Birmingham Dist.*, 229 F. App'x 820, 826 (11th Cir. 2007), an appellate court's review will "be rigorous if the motion is granted rather than denied, … and if the basis for the motion was, as here, the weight of the evidence." *Watts*, 842 F.2d at 311.

In circumstances involving the discovery of new evidence, "[a] motion for a new trial … must not be based on evidence or incidents of which appellants had knowledge prior to return of the jury verdict." *Edwards v. Hyundai Motor Mfg. Alabama, LLC*, 701 F. Supp. 2d 1226, 1233 (M.D. Ala. 2010) (quoting *United States v. Calderon*, 127 F.3d 1314, 1351 (11th Cir. 1997)). Although the evidence had to be unknown to the movant prior to the return of the jury verdict, the evidence must have been in existence at the time of the trial.  *Baucom v. Sisco Stevedoring, LLC*, CIV.A.06-0785-WS-B, 2008 WL 2428930, at *4 (S.D. Ala. June 12, 2008) (identifying several cases across the circuits adhering to this general rule).

"[T]o grant relief based upon newly discovered evidence, a movant must meet a five-part test: (1) the evidence must be newly discovered since the trial; (2) due diligence on the part of the movant to discover the new evidence must be shown; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be such that a new trial would probably produce a new result." *Waddell v. Hendry County Sheriff's Office*, 329 F.3d 1300, 1309 (11th Cir. 2003) (enunciating the five-part test in consideration of a motion under Rule 60(b)(2) based upon newly discovered evidence); *see also Baucom*, 2008 WL 2428930 (relying upon the five-part test in the context of a motion for new trial).

## DISCUSSION

### A.   Motion for Judgment as a Matter of Law

The City contends that it is entitled to judgment as a matter of law based upon two independent grounds: taking the evidence in the light most favorable to Ms. Smart, the evidence first does not establish that Ms. Smart was subjected to severe and/or pervasive sex or gender-based harassment, and second, the evidence demonstrates that the City took prompt preventive and remedial action reasonably likely to prevent the conduct from recurring.  *See* Mot. JNOV at 1.  Plaintiff's opposition is solely that the greater weight of the evidence introduced at trial permits a reasonable jury to find that the City subjected her to a sexual harassment hostile work environment and the City did not take reasonable action to prevent or correct the actionable harassment.  Pl.'s Resp. ¶¶ 3-4 at 2, 4-5.

1.   <u>Factual Underpinning of Harassment</u>

The evidence adduced at trial reveals twelve single-occurring incidents of harassment over the period of time from January 2005 through May 2010.[4]  Taking the testimony in the light most favorable to Ms. Smart, the following constitutes the twelve incidents.

1.   Prior to extending Ms. Smart's probationary period to complete her performance objectives, her immediate supervisors, Captain Thomas Columbano and Lieutenant Charlie Brown, remarked to Ms. Smart that she was "not going to roller skate, like the other females that they have trained in the past in that station."  Trial Tr. vol. IV, 33, Feb. 17, 2012.  Lieutenant Brown then explained to Ms. Smart that this comment reflected his perception that following her "mouth surgery and from there, [she] went downhill."  *Id.*  Ms. Smart admits that she was having difficulty with some of the drills.  *Id.* at 33-34.  Ms. Smart did not report this incident after speaking with Lieutenant Brown about it.

2.   On the first day of training, Ms. Smart's instructors, Firefighters Sid Reese and Charlie Albury, led everyone in introductions.   When Ms. Smart concluded with her introduction, Firefighter Reese commented: "Just for the record, she lives in Miami Shores and she basically took somebody else's spot, she shouldn't be here."  *Id.* at 25-26.  This comment embarrassed Ms. Smart.  *Id.*  She reported the incident to Lieutenant Ray Morris, who was not her primary instructor.  Lieutenant Ray Morris stated that he would report the complaint to the Training and Support Services Division Chief, Javier Otero.  *Id.* at 27.   Chief Otero testified that he investigated every allegation made by Ms. Smart that he was informed of, including speaking with Ms. Smart. Trial Tr. vol. XI, 110, 127-128, Mar. 5, 2012.

---

[4] In addition to these delineated incidents, testimony and evidence related to other instances of harassment were introduced at trial.   However, these events were allegedly taken in retaliation for Plaintiff's complaints of harassment, and thus introduced in relation to Plaintiff's claim of unlawful retaliation, on which the jury ruled against Plaintiff.  Trial Tr. vol. XIII, 20-21, Mar. 7, 2013, ECF No. 189.

3.  One to two weeks into her training, the trainees along with the trainers were performing a running drill on the beach.  Trial Tr. vol. IV, 28.  Firefighters Reese and Albury were running alongside of Ms. Smart and another trainee.  Throughout the run, Firefighters Reese and Albury constantly told Ms. Smart: "You are not going to make it through training, quit now, while you are ahead, let somebody else take the slot."  *Id.*  Ms. Smart did not report this event to anyone because she was told "we are recruits and not to open our mouth." *Id.* 28-29.

4.  In 2005, Chief Otero informed Ms. Smart that the human resources department and the fire chief ordered him to obtain her medical file from her prior employer, Hallandale Beach Fire Department, because of misrepresentations she made during her initial physical examination and deficiencies in her performance during training that she attributed to medical conditions not revealed during her initial physical examination. *Id.* at 29-30, Trial Tr. vol. XI, 28, Mar. 5, 2012; Trial Tr. vol. XII, 130-33, Mar. 6, 2012.

5.  One evening Ms. Smart was called in to relieve someone who was sick.  Upon her arrival, she placed her belongings in a cubicle designated for "combat," although she was assigned to "rescue."  Ms. Smart was told that her belongings were in the wrong area, but left them there when they received a call.  When she returned, she was told that Nick D'alessandro threw her belongings – including her bra, panties, socks, uniform, scrunchie, soap, and deodorant – on the floor.  Trial Tr. vol. IV, 37-39.   Ms. Smart reported the occurrence to Lieutenant Brown, who reprimanded Firefighter D'alessandro. *Id.* at 39.

6.  In 2005, following her training period, Ms. Smart's bathing suit went missing from her unlocked locker for two weeks.  *Id.* at 42-44.  When she and another firefighter, Eric Rodriguez, found it inside of a locker, it was covered in a white substance that Ms. Smart presumed was semen.  There was not a final determination as to what the substance was.  Ms. Smart reported

the incident to Lieutenant Brown.  Ms. Smart, at Lieutenant Brown's request, gave him the bathing suit.  When she asked him about it later, he questioned, "What bathing suit?"  *Id.* at 59-60.  Ms. Smart did not report the bathing suit situation and Lieutenant Brown's response and behavior to anyone. Trial Tr. vol. V, 112-13, Feb. 21, 2012.

7.   In 2007, while working at Station 3, Ms. Smart received a call that her bra was hanging in the station.  She asked two firefighters to put it in a Publix bag and put it in her locker. Trial Tr. vol. IV, 73-74.  When she returned to the station, her bra was in the Publix bag in the locker.  *Id.* at 74.  Ms. Smart never saw the bra hanging, and admits when she reported the incident to Captain Samperi, she told him that the bra had likely fallen out of her bag.  *Id.*; Trial Tr. vol. V, 117.

8.   During a trip to Publix, while riding with Mark Schwartz and Danny Martinez, Ms. Smart hit a parking pole at Publix. Trial Tr. vol. IV, 75-78.  When questioned about the incident by Captain Amata, Firefighter Schwartz interpreted Ms. Smart's explanation to be blaming, or partially blaming him for the incident.  During an argument regarding the same, Firefighter Schwartz called Ms. Smart a "bimbo" and a "cunt," and said: "That's why I don't want to ride with you, you are not a good paramedic."  *Id.* at 81.  Captain Amata heard the exchange and reprimanded Firefighter Schwartz.  *Id.*   Chief Otero also learned of the incident.  *Id.* at 82. Firefighter Schwartz had a verbal counseling session and apologized to Ms. Smart, which she accepted.  *Id.* 82-83.

9.   Chief Otero questioned Ms. Smart about comments Lieutenant Todd and Firefighter Reese made to him about Ms. Smart walking around the station in a tank top and towel. Trial Tr. vol. IV, 83- 84.  There were also unidentified comments that Ms. Smart was promiscuous.  *Id.*

Ms. Smart did not report these comments and denied that she dressed in revealing attire when questioned by Chief Otero. *Id.*

10. On only one occasion, in or around July 2007, while at Station 4, Ms. Smart showered in the station's female restroom when an unidentified male co-worker briefly walked in on her. Trial Tr. vol. IV, 85-87; Trial Tr. vol. V, 115-117.  Ms. Smart was able to identify the male as her co-worker based upon his bottom half being in uniform. *Id.*  The restroom did not have shower curtains, but immediately inside the door to the female restroom is a privacy wall preventing a direct view of the showers from the doorway, but there are mirrors to the side, which "bounces off to the showers."  Trial Tr. vol. IV, 85-86; Trial Tr. vol. XII, 16.  At the time of this incident, Station 4 was a newly constructed facility with three restrooms – a male restroom, a female restroom and a guest restroom. Trial Tr. vol. IV, 84; Trial Tr. vol. XI, 166. Neither the male or female restrooms had locks or shower curtains at the time. Trial Tr. vol. IV, 86; Trial Tr. vol. XII,11, 15, 139-140.  Following this incident, Ms. Smart requested a lock be put on the door, and the City ordered a shower curtain. *Id.*  A shower curtain was not installed until January 2008, some six months later. *Id.*  In the interim, the City gave Ms. Smart a broomstick handle, labeled "Smart Lock" to use as a wedge for the door. Trial Tr. vol. IV, 86, 89-90; Trial Tr. vol. XII, 157-158.

11. In 2007, while at Station 4, Ms. Smart was constantly ignored by Firefighter Reese and Lieutenant Todd when radioing them to see if she needed to assist them and also when attempting to survey accident scenes upon arrival. Trial Tr. vol. IV, 92-94, 161.  Lieutenant Brown did not answer Ms. Smart's or her partner, Firefighter Dorleus' call.  Trial Tr. vol. XII, 79-80.  Chief Otero's investigation revealed that this was a one-time occurrence involving Ms.

Smart.  Also, there were other occasions that day where someone on a call was not responsive to radio calls.  Trial Tr. vol. XII, 79-80.

12. In January 2008, Ms. Smart was transferring from Shift B to Shift C at Station 2 based on the seniority bidding process.  Firefighters Russell Chisolm and Henry Bryant said that they did not want to ride with Ms. Smart.  Trial Tr. vol. IV, 95, 97-98; Trial Tr. vol. XII, 161-164. Lieutenant Thompson also chose not to take an overtime shift working alongside Ms. Smart, by stating, "I am not going to work with that cunt." Trial Tr. vol. IV, 188.  Ms. Smart concedes that it was she specifically that some of her co-workers did not want to ride with and that they had ridden with other female firefighters.  Trial Tr. vol. IV, 16. In response to the statements made by Firefighters Chisolm and Bryant, Ms. Smart was initially advised that she would not be working out of Station 2 because it did not have female facilities, although females had been stationed there before. Trial Tr. vol. IV, 96-97.   However, Otero was immediately advised of the matter and he ordered Firefighters Chisolm and Bryant to work with Ms. Smart at Station 2, which they did. Trial Tr. vol. IV, 98; Trial Tr. vol. V, 17; Trial Tr. vol. XII, 84-85.

Succinctly stated, the few, single-occurring instances of sex or gender-based harassment Plaintiff suffered is simply legally insufficient to maintain a sexual harassment claim under Eleventh Circuit precedent.  Consequently, this jury was without a legally sufficient evidentiary basis to find for Ms. Smart on this issue.

2.     Factors of Hostile Work Environment Sexual Harassment

As I have previously articulated, to establish a hostile work environment sexual harassment claim under Title VII, an employee must show: "(1) she belongs to a protected group; (2) she has been subject to unwelcome sexual harassment; (3) the harassment was based on her membership in a protected group; (4) the harassment was sufficiently severe or pervasive

to alter the terms and conditions of her employment and create an abusive working environment; and (5) a basis for holding the employer liable exists." *Latrece Lockett v. Choice Hotels Int'l, Inc.*, 315 F. App'x 862, 865 (11th Cir. 2009). "[T]o be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives ... to be abusive." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002) (internal quotation marks omitted). The City argues that the fourth and fifth factors entitle it to judgment as a matter of law.

### a.   *Severity or Pervasiveness of Harassment*

As an initial matter, a plaintiff's claim of sexual harassment may not be supported with evidence of non-sexual, non-gender-based harassment. "In a case like this, where both gender-specific and general, indiscriminate [harassment] allegedly pervaded the workplace, we reaffirm the bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII." *Reeves*, 594 F.3d at 809. Rather, "Title VII prohibits discrimination, including harassment that discriminates based on a protected category such as sex." *Id.* "The Supreme Court has 'never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations.' Title VII's test instead is whether 'members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25, 80 (1993)) (internal citations omitted).

Thus, the claim of sexual harassment must be proven with evidence of harassment that is sexual or gender-based in nature. "[I]n order for conduct to rise to the level of sexual

harassment, the conduct must include … conduct of a sexual nature, and innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted." *Herron v. Morton*, 155 F. App'x 423, 426 (11th Cir. 2005) (internal quotations omitted); *see also Agee v. Potter*, 216 F. App'x 837, 840 (11th Cir. 2007) (upholding summary judgment in favor of the defendant where plaintiff's hostile work environment claim was not sexual in nature or arising from conduct was based on her gender).

Only a handful of the incidents Plaintiff encountered – the bathing suit possibly containing semen, being called a "bimbo" and a "cunt," having a male co-worker walk in during a shower, and being called promiscuous – can arguably be considered events that are sexual or gender-based.  The Eleventh Circuit has determined that calling a woman a "cunt" is "gender-derogatory."  *See Reeves*, 594 F.3d at 810-11 (noting that the terms "bitches," "whores" and "cunts," are more degrading to women than to men).  Therefore, many of the events elicited at trial cannot be considered in the determination of whether the sexual harassment Ms. Smart claims to have been subjected to was severe or pervasive.

The limited incidents that are properly considered in the severe or pervasive evaluation are insufficient to maintain a sexual harassment hostile work environment claim under Eleventh Circuit jurisprudence.[5]  The incidents Ms. Smart identifies were single-occurring instances that,

---

[5] *See, e.g., Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238 (11th Cir. 2004) (reversing summary judgment where plaintiff's supervisor fired her for refusing to give in to his sexual advances, which included at least 18 times during the approximately two to two and one-half weeks between his initial advance to plaintiff and her termination, involving propositions for sex, following her into the restroom, repeated attempts to touch her breasts, place his hands down her pants, pull off her pants, and enlisting the assistance of others to hold her while he attempted to grope her); *Miller v. Lectra USA, Inc.*, 145 F. App'x 315 (11th Cir. 2005) (determining that former employee did not present evidence of conduct that was sufficiently severe or pervasive to alter terms or conditions of her employment and create a discriminatorily abusive work environment, where employee alleged three instances in which her female supervisor discussed her sex life with the employee or made advances to male co-worker in employee's presence, and alleged that male co-worker complimented her looks, asked her out, and told her that her marriage was not serious); *Mitchell v. Pope*, 189 F. App'x 911 (11th Cir. 2006) (affirming summary judgment that behavior of a major in a county sheriff's office toward a female employee did not constitute

while inappropriate, vulgar, and offensive, were not severe.  Given that there were three to four

incidents over a five-year period, it certainly was not pervasive.  Rather, two of the more blatant

occurrences, being called sexually degrading names and having her belongings thrown about the

station, came following either a heated argument with Ms. Smart, or an impression that Ms.

Smart disregarded protocol of the station regarding where each firefighter is to put his/her

personal effects.  The evidence demonstrates that the behavior of Ms. Smart's co-workers, again

abhorrent and unprofessional, was related to personality conflicts with Ms. Smart or her co-

workers' perception of her being difficult to work and get along with.  This is neither to justify

the firemen's behavior nor to minimize what Ms. Smart had to endure; it is simply a statement

that the facts, as presented by Ms. Smart, do not legally constitute sexual harassment that is

severe or pervasive, and therefore actionable under Eleventh Circuit jurisprudence.[6]  *See Succar*

*v. Dade County Sch. Bd.*, 229 F.3d 1343, 1345 (11th Cir. 2000) ("Title VII prohibits

---

actionable hostile work environment sexual harassment where the employee pointed to 16 specific instances of offensive conduct over a four-year period, most involving only offensive utterances, and there was no evidence that his behavior unreasonably interfered with the employee's job performance); *Criswell v. Intellirisk Management Corp., Inc.*, 286 F. App'x 660 (11th Cir. 2008) (reversing in part grant of summary judgment on plaintiff's hostile work environment theory of sexual harassment where plaintiff was made to view pornography involving a co-worker on three separate occasions); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798 (11th Cir. 2010) (finding sufficient evidence to present jury question of hostile work environment claim where ample evidence of gender-specific, derogatory, and humiliating comments made daily about women on account of their sex, including male co-workers' and/or supervisor's use of terms "whore," "bitch," and "cunt" and vulgar discussions of women's breasts, nipples, and buttocks, as well as evidence of offensive conduct targeted at employee's gender, including male co-worker's pornographic image of a woman on his computer screen); *Leeth v. Tyson Foods, Inc.*, 449 F. App'x 849 (11th Cir. 2011) (holding that employee failed to present sufficient evidence that superintendent's alleged sexual harassment was sufficiently severe or pervasive to alter terms and conditions of employment and create discriminatorily abusive working environment where plaintiff's supervisor constantly made amorous and sexually-tinged comments to her, he regularly tried to touch her hands, he followed her around constantly, he showed up unannounced at her house on a number of occasions, co-workers routinely commented about the supervisor's affection toward the plaintiff, and he often made advances toward her).

[6] I again want to emphasize that the determination that Ms. Smart cannot maintain a sexual harassment hostile work environment claim is not to be interpreted that this was at all an ideal or professional work environment.  And it is certainly not to suggest that Ms. Smart "asked for" or "deserved" this treatment. In essence, this is no way to run a railroad.

discrimination; it is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of sex discrimination.... The plaintiff cannot turn a personal feud into a sex discrimination case....").

It is well settled that "Title VII does not serve as a 'general civility code.'" *Latrece Lockett v. Choice Hotels Int'l, Inc.*, 315 F. App'x 862, 865 (11th Cir. 2009) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  Thus, "simple teasing ... offhand comments, and isolated incidents (unless extremely serious) do not constitute a hostile work environment." *Id.* At most, this is what Ms. Smart has demonstrated.

Furthermore, there is no comparator who was also subjected to this conduct, despite there being another female trainee.  The other female trainee in Ms. Smart's training class, Digna Abello, *see* Trial Tr. vol. IV, 24; Trial Tr. vol. V, 143, Feb. 24, 2012; Trial Tr. vol. VI, 141, denied ever feeling or being subjected to sexual harassment, and observing Ms. Smart being subjected to such treatment.  Trial Tr. vol. V, 146-47, 152.

The jury, unarmed with the battery of case law in sexual harassment claims, heard, and likely considered, evidence of harassing conduct and conduct that breached the "general civility code," and based their verdict on this conduct, which is of a non-sexual or non-gender based nature.  The sexual and/or gender-based harassment identified by Ms. Smart simply does not support the jury verdict obtained here.  Accordingly, judgment as a matter of law in Defendant's favor is warranted.

b.    *Employer Liability*

The City argues that even if Ms. Smart has established that she was subjected to severe or pervasive sexual harassment, it nevertheless cannot be held liable where it has been established that it exercised reasonable care to prevent and promptly correct any harassing behavior, and Ms.

16

Smart either failed to report the harassment, or the City took prompt reasonable corrective action in the instances when she did report it. *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 745 (1998). This *Faragher-Ellerth* affirmative defense, applicable to employer liability based upon a hostile environment theory, requires the employer to satisfy two elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Madray v. Publix Supermarkets, Inc.*, 208 F.3d 1290, 1296-97 (11th Cir. 2000) (quoting *Burlington Indus., Inc.*, 524 U.S. at 765). The *Faragher-Ellerth* defense shields employers from Title VII liability based on the first part of the first prong of the defense when they maintain and disseminate effective anti-sexual harassment policies. *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1246 (11th Cir. 2004); *Madray*, 208 F.3d at 1296-98. "As to the second part of the first element of the *Faragher/Ellerth* affirmative defense, an employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint." *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001). Lastly, "[a]n employee's failure to take advantage of preventive or corrective measures can take two forms – not using the procedures in place to promptly report any harassment and not taking advantage of any reasonable corrective measures the employer offers after the harassment is reported." *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1306 (11th Cir. 2007). "As to the second element of the defense, an employer's showing that the plaintiff-employee failed to follow its complaint procedures will often be sufficient satisfy its burden." *Frederick*, 246 F.3d at 1314.

Here, it is undisputed that the City maintained and disseminated several policies, handbooks and guidelines prohibiting sexual harassment.  Trial Tr. vol. XI, 111-120, Mar. 5, 2012; *see also Madray*, 208 F.3d at 1296-98 (finding that Publix's maintenance and dissemination of a sexual harassment policy in compliance with Equal Employment Opportunity Commission (EEOC) guidelines satisfied the requirement that an employer exercise reasonable care to prevent sexual harassment).  Nor is there any dispute that Ms. Smart received the policy. Plaintiff does not raise any argument that the policy did not contain reasonable complaint procedures, or that it contained any other fatal defect.  *See Frederick*, 246 F.3d at 1314. Additionally, the City provided multiple avenues to remedy violations, and even had outside labor counsel conduct an 8-hour training session for employees.  Thus, the City has satisfied the first part of the first prong of the *Faragher/Ellerth* affirmative defense.

The record also establishes that in addition to taking reasonable preventive measures, when Ms. Smart complained of the harassment, the City conducted a thorough investigation and took measures to ensure that any harassment would not continue.  Admittedly, Ms. Smart did not report some incidents of the identified harassment.  When she did, in many instances, the conduct did not recur: the inappropriate comments by Firefighters Schwartz and Thompson were remedied with counseling and did not reoccur; the incident in the shower was eventually remedied with installation of the shower curtain and, to the extent that there was a several month delay installing the shower curtain, the incident was a one-time event and did not happen again during the interim. *Quick v. City of Birmingham*, 346 F. App'x 494, 496 (11th Cir. 2009) (finding no evidence of harassment where there were no dedicated restrooms or locker rooms for women as there were for men, when evidence established that the stations had been built years before the City began to hire female firefighters and that it gave the women access to private showers and

bathrooms).  Similarly, with respect to the incidents involving Ms. Smart's bathing suit and bra, the record reflects that there was not reoccurrence of events of this nature after the Plaintiff notified the City.

Nevertheless, "reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions" regarding whether the City acted to promptly correct the incident involving the bathing suit and being walked in on while showering.  Reviewing the evidence in the light most favorable to Ms. Smart, as the nonmovant, no corrective action was taken following her report regarding the bathing suit incident.  In fact, after Lieutenant Brown confiscated the bathing suit, he denied knowing about the incident.[7]  Also, the City's response to Ms. Smart's complaint concerning the lack of a lock on the women's shower area by giving her a wooden stick called a "Smart Lock" can be interpreted by a reasonable and fair-minded jury as not being corrective, but insensitive, humiliating, and exacerbating the harassment.  On these grounds, the City has not conclusively demonstrated that the great weight of the evidence entitles it to the benefit of the *Faragher/Ellerth* affirmative defense.

However, because Ms. Smart is unable to establish that she suffered sexual and/or gender-based harassment sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment, the City is entitled to judgment as a matter of law despite not being able to sustain every element of the *Faragher/Ellerth* affirmative defense.

**B.      Motion for New Trial**

As previously stated, Defendant moves for a new trial based upon the greater weight of the evidence being contrary to the verdict, discovery of new evidence of Plaintiff's and her

---

[7] Although there is a significant factual dispute regarding this incident, the jury was at liberty to credit Ms. Smart's version of the events.

mother's witness tampering, and the inclusion versus the exclusion of certain evidence.  Pursuant to Federal Rule Civil Procedure 50(c), a new trial should only occur in the event that the judgment in favor of Defendant is later vacated or reversed.

The discussion above reveals that the City is entitled to a new trial because the great weight of the evidence, especially given that the jury considered non-sexual, non-gender-based harassment, does not support the verdict rendered.  Also, the City is due a new trial to prevent a miscarriage of justice.

The evidence overwhelmingly demonstrates that Plaintiff and her mother attempted to prevent and/or alter the testimony of two witnesses: Firefighter Daniel Kokoram and Lieutenant Charles Brown.  "Before dismissing an action [for witness tampering], the Court must find by clear and convincing evidence not only that the misconduct was committed in bad faith, but also that no lesser sanction would adequately punish and deter the violation." *Quiroz v. Superior Building Maintenance, Inc.*, No. 06-21594-CIV, 2008 WL 3540599 (S.D. Fla. Aug. 12, 2008). According to the Supreme Court, "clear and convincing evidence" is an intermediate standard of proof that lies somewhere between "proof by a preponderance of the evidence" and "proof beyond a reasonable doubt." *Kenyeres v. Ashcroft*, 538 U.S. 1301, 1305 (citing *Addington v. Texas*, 441 U.S. 418 (1979)).  "A party [] demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order."  *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (quoting *Primus Automotive Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir.1997)).

The record reveals that Ms. Smart attempted to intimidate Lieutenant Brown into testifying favorably for her by threatening, through Firefighter Kokoram, to testify that Lieutenant Brown made inappropriate sexual advances toward her and that he had "come on to

her."  Also, Ms. Smart tampered with Firefighter Kokoram directly.  Once Ms. Smart learned that Firefighter Kokoram was going to be called to testify regarding the threats she made to Lieutenant Brown, via Firefighter Kokoram, Ms. Smart tried to telephone Firefighter Kokoram herself during a brief recess in the trial proceedings.  When the break in trial concluded without having reached Firefighter Kokoram, Ms. Smart engaged her mother, Maria Cruz, to place the call to Firefighter Kokoram.  Ms. Cruz began calling Firefighter Kokoram only 11 minutes after the Plaintiff unsuccessfully tried to reach him.

After receiving three calls and two voicemails, the last one citing an "emergency," Firefighter Kokoram returned Ms. Cruz's call.  Unbeknownst to Ms. Cruz, Firefighter Kokoram was in the presence of the City's two attorneys and put the call on speakerphone.  During the call, Ms. Cruz informed him that Ms. Smart asked that she call him and suggest that he avoid service of any subpoena, and that if he is called to testify and is asked about conversations he's had with Ms. Smart, his response should be that their conversations only pertained to training issues.

During a hearing on this matter, Ms. Cruz admitted that she engaged in this attempted tampering, but did so on her own volition and not at the behest of Ms. Smart.  When questioned how she was able to proceed with such a plan without the name and contact information of Firefighter Kokoram, she responded that she cold-called fire stations, and was given his number without even identifying herself or knowing Firefighter Kokoram's full name.  Since the trial, the City has been able to a review the City's Fire Department's phone system, which captures every incoming telephone call, and the review shows no such calls were made to any fire station.

Given the new information, these facts clearly demonstrate that Ms. Smart and Ms. Cruz, in bad faith, sought to disrupt and undermine the proceedings by manipulating Firefighter

Kokoram into failing to appear for trial and to have Firefighter Kokoram coerce Lieutenant Brown into testifying favorably for Plaintiff.  For this behavior, the lesser sanction of a new trial, especially in light of judgment as a matter of law being entered in Defendant's favor, is warranted.

## CONCLUSION

For the aforementioned reasons, it is hereby **ORDERED and ADJUDGED** that Defendant City of Miami Beach, Florida's Rule 50(b) Renewed Motion for Judgment as a Matter of Law (ECF No. 173) is **GRANTED**, and Defendant City of Miami Beach, Florida's Alternative Motion for a New Trial (ECF No. 178) is **DENIED** *as moot*.  Pursuant to Federal Rule Civil Procedure 50(c) requiring a conditional ruling on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed, Defendant City of Miami Beach, Florida's Alternative Motion for a New Trial (ECF No. 178) is *conditionally* **GRANTED**.  A separate judgment in favor of Defendant City of Miami Beach, Florida will not issue, as this Order will constitute the judgment in full.  *See* Fed. R. Civ. P. 58(a)(1) & (4).

All pending motions, if any, are **DENIED** *as moot*.  The Clerk is directed to **CLOSE** this matter.

**DONE and ORDERED** in chambers at Miami, Florida this 26th day of March 2013.

_____
MARCIA G. COOKE
United States District Judge


Copies furnished to:
*William C. Turnoff, U.S. Magistrate*
*Counsel of Record*

22